## THOMAS DUFFY *vs.* CHARLES B. CALVERT, *Exec'r of* GEORGE CALVERT AND OTHERS.—*December,* 1848.

A controversy respecting the validity of the will of *T. C.,* was adjusted by the heir-at-law, conveying by deed all her interest in the real estate of the testator to *G. C.* the executor and ulterior devisee under the will, *in trust* " first to pay her the sum of $30,000," and after reimbursing himself the expenses incurred in contesting the will, then in *further trust,* "for the purposes and trusts expressed in the said will of *T. C.* and the codicils thereto." These trusts were for payment of several annuities and pecuniary legacies to persons specially named, charged upon the lands which the executor had power to sell for that purpose. By one of the codicils, it was provided, that if the provisions of the will should fail, then the estate was to go to "*G. C.* and his heirs." In 1837, *G. C.* as trustee under this deed, sold a part of the lands to the appellant, and afterwards died, leaving the appellee his executor, who in 1841, recovered judgment upon three of the bonds of the appellant, given for the purchase money. This judgment was revived in 1846, and a *fi. fa.* issued thereon; the last instalment of the purchase money having, in the mean time, become due. The appellant then filed a bill in Chancery against all the heirs of *G. C.* and all the *cestui que trusts* under the will, many of whom were minors, to enjoin the executor until a trustee should be appointed by the court, to receive and apply the whole purchase money, which he is willing to pay whenever there is a person in being competent to convey the land so sold to him by *G. C.* in his life-time. *Held,*

That upon the death of *G. C.* the trust descended to his heirs-at-law, some of whom being minors, were legally incompetent to discharge its functions; and the purchaser, being bound to see to the application of his purchase money, has adopted the true and safe course for his protection.

A proceeding in equity against the heirs of *G. C.* for a title, would not discharge the purchaser from seeing to the application of his purchase money, and therefore, the *cestui que trusts* of the will are necessary parties to any proceeding looking to a conveyance to the appellant.

Any attempt to enforce payment of the purchase money, without such assurance of title, was properly met by the appellant, in bringing before the court all the parties in interest united, and enjoining them until a trustee should be substituted for the original trustee, to receive and apply the purchase money, and convey the lands.

By the act of 1831, ch. 311, sec. 11, mere naked trusts, where the trustee has no beneficial interest or estate whatsoever in the lands, descend to the heir at common law.

But in this case, the right of the trustee to reimburse himself out of the trust in his hands, the heavy expenses incurred in the attempt to sustain the will, and the ulterior limitation in his favor in the codicil, are clearly such beneficial interests as must exclude this trust from the operation of that act.

Duffy *vs.* Calvert.—1848.

Where trusts are general, as for payment of debts generally, the purchaser is not bound to see to the application of his money, but if for payment of legacies or debts, scheduled or specified, the trust being defined and limited, he is so bound.

In this case, the trusts being for payment of annuities and pecuniary legacies to parties specially named, and which by the instrument creating them, are expressly charged upon the lands: they are precisely such charges as the purchaser is to see extinguished.

When it is said in *Willis on Trustees*, 56, "trusts, when of realty, devolve by the death of the trustee on his heir-at-law; when of personalty, they vest in his executor or administrator," it is not meant that where the trust is originally of personal estate, and has been in part executed by sale by the original trustee, it can become personalty, and be consummated by the executor. All the authorities agree, that where the legal estate descends to the heirs-at-law, the trust is transmitted with it.

In equity, the party beneficially entitled to the produce of the estate—that is to say, the *cestui que trust* of the purchase money, and not the trustee or donee of the power of sale, is considered to be the owner.

Unless the trustee is authorized by the terms of the deed itself, to give a receipt and discharge the purchaser from seeing to its application, or the trusts are undefined and general in their nature, the rule is uncontroverted, that the purchaser must see his money properly applied.

The right to a good title, is a right not growing out of the agreement between the parties, but given by the law, that as the purchaser parts with good money, the vendor shall give an estate with a clear title.

APPEAL from the Court of Chancery.

On the 22d February, 1847, the appellant filed his bill against *Charles B. Calvert*, executor of *George Calvert* and others, alleging that *Thomas Cramphin* died in the year 1830, leaving a last will and testament, and codicils thereto, by which he appointed *George Calvert* his executor and residuary legatee. That probate of said will was contested; a *caveat* being filed thereto by *Thomas Davis* and *Elizabeth*, his wife, who was the heir-at-law of said *Cramphin*, upon which such proceedings were had, as that the said will was refused to be admitted to probate, and so the said *Cramphin* died intestate. That afterwards, on the 1st December, 1835, the said *Elizabeth*, heir-at-law as aforesaid, having survived her husband, and the said *George Calvert*, in pursuance of an agreement entered into between them, executed a certain indenture, whereby the said *Elizabeth* conveyed to the said *Calvert*, all the real estate

of which said *Cramphin* died seized or possessed, *in trust* that said *Calvert* should first pay to said *Elizabeth*, the sum of $30,000, and then reimburse himself for the amount so paid, and all expenses theretofore incurred by him in contesting said will, and then hold the said estates and the proceeds thereof, to and for the same uses and trusts, as are expressed in said will of *Thomas Cramphin*, and the codicils thereto. That further, in pursuance of said agreement, the said *Calvert* became administrator of the personal estate of *Cramphin*, all of which was disposed of by him as such administrator, in his life-time.

That as trustee under said deed, and by virtue of the powers thereby given him, said *Calvert*, on the 12th August, 1837, sold a portion of said real estate to complainant, for which he executed his four single bills in favor of said *Calvert*, as trustee, each for the sum of $713 12½, payable in one, two, three and four years respectively, and dated the said 12th August, 1837.

That said *George Calvert* afterwards died, leaving a last will and testament, by which he appointed his sons, *Charles B.* and *George H. Calvert*, his executors, and that said *George H.* having renounced said trust, letters testamentary were duly granted to said *Charles B. Calvert*, who afterwards as such executor, instituted suit in *Montgomery* County Court upon three of said bills, and recovered judgment thereon in March, 1841. That in November, 1846, this judgment was revived by a *scire facias*, and a writ of *fi. fa.* issued thereon, which has been laid upon the lands and effects of the complainant, which have accordingly been advertised for sale by the sheriff.

The bill further charges that complainant purchased said lands from *George Calvert*, under an assurance and promise from him, that he would give a good and valid title thereto. That relying upon this promise, he has made great improvements upon the lands, and greatly enhanced their value. That since the death of said *George Calvert*, intestate, as to the trust estate conveyed to him by said *Elizabeth Davis*, your orator is advised the said trust and power to convey a good title, is not in his executor, *Charles B. Calvert*, but is either suspended

until a trustee is properly appointed by a court of equity, or vested in the heirs-at-law of said *George* generally, or in his heirs and those of said *Elizabeth Davis,* conjointly. That the lands so purchased by him are charged with the trusts created by the indenture before referred to, and that it is incumbent upon a purchaser under said trust, to see that the funds are paid to a person legally and equitably authorized to receive and apply the same, otherwise they may be made chargeable again. That the provisions of the said deed of trust have not been complied with by said *George Calvert;* and although your orator is anxious and willing to pay the purchase money for said lands, if a good title thereto can be had, he is advised that he cannot safely pay the same to *Charles B. Calvert,* executor as aforesaid, because he is not the trustee, and has not the power to convey the lands, or to give your orator an entire acquittance and discharge, so as to relieve him and the lands from all future liability on account of the same.

The bill then prays for an injunction, restraining execution of the judgment against complainant, for the appointment of a trustee, to receive the purchase money and convey the lands to him, and for general relief. The heirs-at-law of *George Calvert,* some of whom are minors, and the legatees under *Cramphin's* will, who are the *cestui que trusts* mentioned in the aforesaid deed of trust, were made defendants to this bill.

The will of *Cramphin,* Exhibit A, was executed the 30th June, 1824. The testator, after payment of debts, &c. and a conditional devise of certain real estate to his nephew, *Dr. John Bowie,* bequeaths to *Elizabeth Williams,* a negro woman and $500, and to *Arianna, Elizabeth* and *Anne Williams,* her three daughters, each a negro slave and $500; to *Richard Williams,* her son, a negro slave and $1,500; to *Caroline Calvert,* her choice of ten negroes—all his household and kitchen furniture—all his plate, liquors, groceries, provisions, &c.—all the crops growing on his dwelling plantation, stock and farming utensils, &c. thereon; and also devises to her, all said dwelling plantation, containing between eight hundred and one thousand acres of land, for and during the term of her single life. "And

lastly, all the rest and residue of my estate, real, personal and mixed, legal and equitable, I hereby give and devise in fee simple, to my confidential friend, *George Calvert*, of *Prince Georges'* County, *Maryland*, in trust for the support, education and benefit of the children of the said *Caroline*, viz: *George, Caroline, Elizabeth, John, Henry, Henrietta, Maria, Thomas, Adolphus, Marietta* and *Richard*, with power to appoint and keep under him, agents and managers from time to time, to attend to the said property and estate, who are to be under his control and direction, and with power and authority also, if he shall think it most for the benefit of the said children, to sell all the said estate and property, or any part thereof, at public or private sale, (with power also to convey the same to the purchaser or purchasers thereof,) and the proceeds of such sales to re-invest in whatever way he shall think best, for the fulfilment of this trust, and to divide and apportion among the said children and their heirs, the said estate and property, and the profits and proceeds thereof, equally, as they severally arrive at the age of twenty-one, as to the males, and of eighteen, as to the females, or as they severally become married; and if either of the said children should die under age and without issue, then the survivors to be entitled to the share or interest of such child or children so dying; and in case all the said children should die, or should be in any manner incapable to take the benefit of this trust from any cause whatsoever, then the said *George Calvert* is to hold all the said estate and property, in trust for the said *Caroline Calvert*, her heirs and assigns forever;—and I do hereby constitute and appoint the said *George Calvert*, executor of this my last will and testament, revoking," &c.

By a codicil, dated 1st November, 1824, the testator revokes the provisions of his will in favor of *Caroline Calvert*, and in lieu thereof, among other things, directed his executor to pay her an annuity of $500 *per annum* during her life, and further wills and directs that the said property devised and bequeathed to the said *Caroline*, should be vested in his trustee and executor, " in fee simple, to be held and applied by him to the

purposes and trusts contained and set forth in my said last will and testament, in the last clause and section thereof." By a second codicil, dated the 14th October, 1825, he revokes the devise of land to his nephew, *Dr. John Bowie*, and directs the same to go with the rest of his estate to his friend, *George Calvert*, " his heirs or assigns," according to the last section of his said will, and then proceeds : " I do hereby further devise, that all the estate, real, personal and mixed, of which I may die seized and possessed, or to which I have any right or title, and which may not be devised by my said will and the codicils thereto, or which may not be effectually devised, or which may be devised to persons under any legal disability to take the benefit thereof, shall go to the said *Geo. Calvert*, his heirs and assigns forever."

Exhibit *B* is the indenture referred to in the bill between *Elizabeth Davis* and *George Calvert*. It is dated the 1st December, 1830, and after reciting the execution of the will of *Cramphin*, with its codicils, and the successful contestation of the same by said *Elizabeth* and her husband, *Thomas Davis*, "And whereas, by the force and effect of the said proceedings, the said *Thomas Cramphin*, appears to have died intestate, and the said *Elizabeth Davis* is the heir-at-law and next of kin of the said *Thomas Cramphin*, and as such, entitled to all the real and personal estate and effects of the said deceased;" proceeds to convey to said *George Calvert*, " his heirs and assigns forever," all the real estate of which *Cramphin* died seized and possessed, and the rents and profits thereof from the time of his death, " *in trust* that he shall, in the first place, pay and satisfy the said *Elizabeth Davis*, her executors," &c. " the sum of $30,000, which shall be and remain the first lien upon the estate hereby granted, as fully as if secured by a deed of mortgage;" and after payment of this sum, " then *in trust* that he, the said *George*, shall and may reimburse himself the said amount so paid to the said *Elizabeth*, and all and every such expenses and disbursements, which he, the said *George*, has heretofore made and incurred in and about the contestations respecting the said estate, or the agency in the management of

the same, or which he may hereafter incur, in and about the same, and which would, or ought to be allowed to him in the settlement of his account as executor or trustee, in case the said instruments and writings had been established as the last will and testament, and codicils thereto, of said *Thomas Cramphin,* deceased,—and that subject to and after the payment and reimbursement as aforesaid, then to hold, apply and appropriate the estates hereby granted, or in case of the sale of them, or any part thereof, the said proceeds to and for the same uses, trusts, purposes and objects as are expressed and declared in the said instruments of writing, purporting to be the last will and testament, and codicils thereto, of said *Thomas Cramphin,* deceased."

The bonds of the purchaser and a copy of the judgments recovered thereon, are also filed with the bill.

The Chancellor (JOHNSON) ordered the injunction as prayed.

The answer of *Charles B. Calvert* admits the death of *Cramphin,* the execution of his will and codicils thereto, the successful contestation of the same by *Davis* and wife, the execution of Exhibit B, the granting of letters testamentary on the personal estate of *Cramphin* to *George Calvert,* the sale of the land by him to complainant, his subsequent death, leaving a last will and testament, which being executed prior to Exhibit B, defendant is advised to admit that the legal estate in the lands conveyed, subject to the said trusts and to the sales, or agreements for sale, made by said *George Calvert,* descended to all his children and heirs-at-law. It is also admitted that letters testamentary on the estate of said *George,* and letters of administration *d. b. n.* on the estate of *Cramphin* were granted to defendant. That respondent, as executor of said *George,* instituted suit and recovered judgment as charged in the bill, and that he has ordered execution thereon, and he insists on his right so to do, since the title to the land sold to complainant is unquestionable, and the latter has had ample time within which he might have obtained a conveyance therefor from the heirs of said *George Calvert,* deceased. He is advised to deny that the legatees or devisees named in the said

last will and testament of said *Cramphin,* and codicils thereto, are material or necessary parties to the suit.

The Chancellor, on the 16th May, 1848, dissolved the injunction by the following order:—

By the will and codicils of the late *Thomas Cramphin,* executed in the years 1824 and 1825, he devised and bequeathed, in fee simple, to his friend, *George Calvert,* his real and personal estate, upon certain trusts; and with power to the trustee, in his discretion, to sell the whole, or any part of said estate, and to convey the same, and to invest the proceeds as he might think best for the fulfilment of the trust.

It does not appear to me to be material to examine, critically, the provisions of these instruments, for the purpose of ascertaining the precise nature of this trust.  It is sufficient to say, that there can be no doubt of the power of the trustee to sell and convey the trust property ; nor can it be doubted, that the trustee, making such sale, could sue and recover the purchase money as could the executor of the trustee, upon a note or bond taken by him to secure its payment; and indeed, the judgment itself is conclusive in favor of such right.

The trustee, in pursuance of the power vested in him, did in August, 1837, sell to the plaintiff in this case, parcel of the real estate of the testator, *Cramphin,* and took from him his four several sealed notes, for $713 12 each.  *Calvert,* the trustee, having died, and three of the notes being due and unpaid, suit was brought upon them by the defendant in this case, as executor of the trustee; and at March term, 1841, judgment was rendered upon them.  This judgment not being paid, a *scire facias* was sued out upon it, and a *fiat* entered at November term, 1846, upon which the writ of *fieri facias* was issued to March term, 1847, of the *Montgomery* County Court.

The bill filed in this case prays for, and an injunction was granted, to stay execution upon this judgment, upon the ground of obscurity in the title to the land purchased, or at least, the difficulties which now environ it, caused by the death of the trustee who made the sale.

The purchaser, it seems, was let into possession at the period of the purchase, and has remained so in possession to the present period. One of the allegations to the bill being that he has since his purchase, essentially enhanced the value of the property, by building, planting and fencing. The judgment to stay execution, upon which the bill was filed, was rendered upon three of the notes given for the land; the fourth at that time not having matured: and the question therefore now is, shall the purchaser be protected by the injunction of this court from the payment of these instalments, until it is fully ascertained through what channel the title is to be passed to him. This title he cannot get, nor was it the agreement of the parties he should get, until the whole purchase money should be paid. He had been in the possession and enjoyment of this property for nearly ten years when he filed this bill; had suffered two judgments at law, the original and the *fiat*, to be recovered against him, and then asks for equitable relief, not upon the ground of blemish in the title of his vendor, (for that must be conceded to be good,) but upon the ground, that there is now some difficulty in determining by whose hand that title is to be conveyed to him. It is said by *Sugden*, that " if a purchaser take possession under a contract, and he afterwards rejects the title, he must relinquish the possession, and equity cannot prevent the vendor from turning him out by an ejectment, although he may have expended money in improvements." 2 *Sugden's Vendors*, 15.

But here, the purchaser retains the possession, and asks the aid of this court to arrest the vendor in his attempt to collect the purchase money, or rather a part of the purchase money, upon the payment of which part, he would not be entitled to a conveyance of the title; not upon the ground of a defect in the title itself, but upon a doubt as to the person by whom the title, at the proper time, is to be conveyed.

There can be no doubt, either that the title has descended upon the heirs-at-law of the trustee, as the answer supposes, or that this court is competent, at the proper time, to authorize

a transfer of it to the purchaser; and in either case, when he has a right to call for it, he will receive a conveyance.

For this reason, I am of opinion that the injunction must be dissolved.

From this order, the complainant appealed to this court.

The cause was argued before Dorsey, C. J., Spence, Martin and Frick, J.

By Richard J. Bowie for the appellant.

The injunction in this case, was applied for on the ground, that there is no hand, in legal being, to receive the purchase money; and payment to the legal plaintiff, *Charles Calvert, ex'r of George*, would be payment in the complainant's own wrong, and in wrong of the " *cestui que trusts* " of *Elizabeth Davis*, whose deed to *George Calvert*, deceased, created such trusts, as obliged the complainant, to see to the application of the purchase money. The deed of *Mrs. Davis* to *George Calvert* sets up the will and codicils of *Thomas Cramphin*, which had been before set aside, and charges all the real estate conveyed by her to *George Calvert*, with payment of the legacies given by the said *Cramphin*, in his will and codicils, after first paying the grantor a specific sum, and reimbursing the grantee certain costs, charges, and expenses.

The terms by which these trusts are created are as follows:

" In trust to hold, apply, and appropriate the estates hereby granted, or in case of the sale of them, or any part thereof, the said proceeds, to and for the same uses, trusts, purposes and objects, as are expressed and declared in the said instruments of writing, purporting to be the last will and testament, and codicils thereto of the said *Thomas Cramphin*," (*vide* deed from *Elizabeth Davis* to *George Calvert*, 1st December, 1835.)

The death of *George Calvert*, the original trustee, is admitted; the deed makes no provision for the appointment, or substitution of other trustees, upon his death: in the absence of which, the legal estate in the lands conveyed by *Mrs. Davis*, and purchased in part by complainant, devolved upon the heirs-

at-law of said *Calvert*, some of whom are minors: the will of said *Calvert* appointing *Charles Calvert*, the appellee, and another, his executors, having been made long prior to the deed of *Mrs. Davis* to him.

For the position, that trusts descend, as other estates, to the heirs-at-law of the trustee, *vide Cruise Title Trust, ch. 2, vol.* 1, *pp.* 484, 485, *in margin. Lewin on Trusts, ch.* 14, *p.* 242, *Lon. edition,* 1837.

Naked trusts, or when the trustee is seized without being entitled to any beneficial interest descend as at common law, 1831, *ch.* 310, 311. The appellee, *Charles Calvert,* is neither trustee at common law, or under the act to direct descents. The act of 1785, *ch.* 72, sec. 4, in spirit, if not in letter, clearly embraces the case now submitted, it provides that if any person hath died or shall die, leaving real or personal estate to be sold, and shall not appoint a person *to sell* or *convey* the said property, or if the person appointed, shall neglect, or refuse, or die before the execution of such trust, so that the sale cannot be made for the purposes intended, the Chancellor shall have power, on application of any person interested in the sale of such property, to appoint such trustee for the purpose of selling and conveying such property, and *applying the money arising from the sale* to the purposes intended.

*Mrs. Davis*, or *Thomas Cramphin*, has died, leaving land to be sold and conveyed, and the proceeds to be applied to certain purposes; *George Calvert* was appointed trustee, and has died before the execution of the trust; the complainant, a purchaser under the trust deed, applied to the Chancellor to appoint a trustee to convey the property and apply the money arising from the sale.

The principle of this act of Assembly, is the long established and well known maxim of equity, that the purchaser shall not pay his money, without obtaining a good title, or in other words, shall not pay the purchase money to one who is incapaple of giving him a full and final discharge. *Atkinson on Titles, p.* 379. *Ogilvie vs. Foljambe, 3 Mer.* 53.

63      v.6

When there is a hand appointed to receive, the purchaser is not generally bound to see to the application of the purchase money, but it is always incumbent on him to see that the purchase money is paid to a person authorized to receive it and give him a discharge.

" In equity, the party beneficially entitled to the produce of the estate, that is to say, the *cestui que trust* of the purchase money, and not the trustee, or donee of the power of sale, is considered to be the owner, and on this principle it is, that the purchaser is bound, at the hazard of having his money to pay over again, to pay it to the *cestui que trust*, or see that it comes to his hands, or in other words, to see to its application." *Vide Atkinson on Titles, p.* 597.

By the death of *George Calvert*, the hand appointed to receive and convey and apply the funds, is cut off. A mere stranger, technically speaking, is invested with the legal power to collect the money, but the power to convey, is either "*in gremio legis*, or in third persons, *cestui que trusts*," some of whom are under legal disabilities.

If the purchaser has a right to have all incumbrances paid off, out of the purchase money, he certainly is entitled to the aid of a court of equity (independently of the act of 1785) to transmit the funds to those " beneficially entitled to the produce of the estate." It is assumed, that *Charles Calvert, ex'r of George*, is equitably, as well as legally, the hand entitled to receive, and upon full payment to him, the Court of Chancery will then perfect the title. What, if after payment to the defendant, as executor of *George*, the heirs-at-law, legatees and " *cestui que trusts*," should insist that the purchaser was bound to see to the application of the fund ? that they have not been properly appropriated ? and this court should think with them; the complainant would have parted with his money; the lands would still be liable to the charges imposed on them, and the complainant without redress.

" It hath become a settled and invariable rule, that a purchaser shall not be compelled to accept a doubtful title." 2 *Peere Wm's.* 198. Neither will he be compelled to take an

equitible title, nor will a case be directed to the judges as to title, unless the purchaser be willing it should. *Sugden's Vendors,* 243, 2d *American from* 5th *London Edition.*

This does not extend to estates sold under a decree, for although the legal estate is outstanding, and cannot be immediately got in, yet if the person seized of the estate is a party to the suit, the court will compel the purchaser to accept the title, and decree generally that the legal tenant shall convey, and the purchaser in the meantime hold and enjoy. *Ibidem,* 248.

The complainant here, only seeks to place himself in the position of a purchaser under a decree, by bringing into this court all the " *cestui que trusts,*" that they may be required to convey through a trustee, and thus obtain the sanction of this court, to a title which, without it, will not only be doubtful, but worthless.

If a purchaser will not be required to accept an equitable title, he surely will not be compelled to pay the purchase money to one, who cannot give him even that, and be forced afterwards to resort to a Court of Chancery for redress.

This is not a case in which the vendee can be said to have waived any objection to the title, by occupying and improving. The vendor, *George Calvert,* had the right to sell and convey; by his death, the office and estate of the trustee became severed, or devolved on those who were incapable of discharging the office, so as to convey the estates: the vendee waited until the office and estate should be re-united, either by the act of law, through a decree of the court, or by operation of time. The coercion of the defendant, in the meantime, forced the complainant to seek that protection which the heirs of the vendor should have been the foremost to proffer, for it is most unreasonable, if not inequitable, to compel a purchaser to pay for land and give no assurance, but that he may seek it, where he can get it.

The complainant being entitled to an indisputable legal title upon payment of the purchase money, should be indemnified out of the same for all costs and expenses incurred in obtaining it; and he could only obtain this allowance from a court of

equity: if he should be compelled to pay the purchase money before a trustee is appointed with power to convey, he must pay those costs out of his own pocket, or the heirs of the vendor (who was only acting in a fiduciary capacity) must incur the expense.

The injury to the appellant would be irremediable, if he should be compelled first to pay the purchase money to the defendant, *Charles Calvert, ex'r of George,* and afterwards, to seek his title from the heirs-at-law of *George Calvert.*

*Sir Edward Sugden,* speaking of the rule that a purchaser under a decree is compellable to take an equitable title, well says, "the injustice of it is too glaring." "The decree of a court of equity acts *in personam* and not like a judgment-at-law, *in rem,* and it is possible, that the court may never be able to compel the person seized of the legal estate, to convey to the purchaser." *Sugden on Vendors,* 250, *2d Am. from 5th London Edition.* This difficulty, as far as relates to the conveyance of the title is obviated by the substitution of a trustee, under the act of 1785, but no means exist to enable the court to compel absent defendants to pay the costs to the purchaser, in whose behalf a conveyance is decreed. On the other hand, no injury is sustained by enjoining the payment of the purchase money, until the means of perfecting the title are matured; the property being bound for the amount, as well as the sureties on the bonds given for the purchase money, and the delay being compensated for by the payment of interest; and the interests of the legatees being promoted by placing the fund under the control of the Court of Chancery.

Regarding the trusts of the will of *Thomas Cramphin* as specific liens upon the property sold by the late *George Cal. vert* as trustee, the purchaser had no alternative, but to seek the protection of the Court of Chancery.

The will and codicils of *Thomas Cramphin,* which are referred to by the deed of *Mrs. E. Davis,* create trusts, devise and bequeath legacies and annuities; all these are expressly charged upon the lands conveyed by *Mrs. Davis* to *Mr. Calvert,* by the terms of the deed before quoted.

If an estate be charged with the payment of annuities or legacies, the annuitants or legatees are to be considered, *pro tanto*, the owners of the estate; and if the purchaser pay over his money to the trustees upon their receipt, without seeing it applied in liquidation of these particular charges, or otherwise seeing that they are satisfied, he will be liable to pay his money over again, to the extent of the unsatisfied charges, in case the trustee should waste or misapply the purchase money. *Atkinson on Titles, p. 597, London Edit.* 1833.

The learned Chancellor expressly waived the examination of this view.  He says: "It does not appear to me to be material to examine, critically, the provisions of the instruments, for the purpose of ascertaining the nature of this trust. It is sufficient to say, that there can be no doubt of the power of the trustee to sell and convey the trust property; nor can it be doubted, that the trustee making such sale, could sue and recover the purchase money, as could the executor of the trustee, upon a note or bond taken by him to secure its payment."

He did not reflect that the parties before him were not the trustee, and the purchaser, but the executor of the trustee and his heirs, *some of whom were legally incompetent to convey;* nor did he consider, that a power to sell and convey, does not dispense with the obligation on the purchaser to see to the application of the purchase money in limited trusts.

" In all properly drawn deeds or wills creating trusts of this description, there is a clause enabling the trustee to give the purchaser a good receipt, and expressly discharging him from seeing to the application of the purchase money.  Wherever there is such a clause, the purchaser is exonerated from all question on the subject." *Atkinson on Titles,* 598, 599.  The complainant does not question the executor's power to collect at law, but invokes the injunction of a court of equity, to restrain the abuse of that power, until a power to convey and release the property conveyed from all future liability, can be substituted by a decree of the Court of Chancery.

By T. S. ALEXANDER for the appellee.

*First.* The appellee's first point is, that the purchaser in this case is not bound to see to the application of his purchase money, and therefore, the *cestui que trusts* are not necessary parties to the suit.

Where the trusts are defined and capable of immediate execution, the purchaser must apply his money properly. Where the trusts are continuing, and the purchaser could not be reasonably expected to look after its application, he may pay the purchase money to the trustee. 3 *Sugd. Vend.* 98, (154.) As where the *cestui que trusts* are infants, 4 *Madd.* 142, *Sowarsby vs. Lacey.* Or where the trust in part was for re-investment or debts to be paid at a future day, 16 *Ves.* 151, *Balfour vs. Willand.* The result of all the cases collected by *Mr. Sugden* appears to be that where there is a hand appointed to receive, and discretion is to be exercised in the appropriation of the fund, or its ultimate application is necessarily postponed to a future day, the purchaser cannot be required to see to the application of his purchase money. In the present case, the trusts as to the proceeds of the realty, are—

1. To pay an annuity to *Caroline Calvert* during her life.

2. To provide for the support of her children during minority.

3. To distribute the proceeds amongst the children as they severally attain their full ages.

Many of those trusts are yet continuing, and may endure for fifteen or twenty years to come. I do not understand the appellant's counsel to contend that the purchaser would have incurred risk by payment of the purchase money to *George Calvert,* the original trustee, in his life-time. The objection is rather, that the death of *George Calvert* has vacated the office of trustee, and there is at present no hand to receive the funds. Now, it will be found by recurring to the will of *Cramphin* and to the deed from *Mrs. Davis,* that the trust is to "*George Calvert,* his heirs, executors and administrators," and on the death of the trustee, if the fund had consisted of lands

exclusively, the office would have devolved on his heirs-at-law, if it had consisted of personal estate, on his executor or administrator. *Willis on Trustees*, 53. 10 *Law Library*, 24.

If it is assumed that the trust fund consisted in part of realty, and in part of personalty, then the heir-at-law became trustee of the realty, and the executor became the trustee of the personalty.

The bonds in question in this suit therefore devolved on *Charles B. Calvert*, as executor of *George*, the original trustee, and the legal estate in the land sold descended to the heirs-at-law, charged with or bound by the agreement between the original trustee and the purchaser.

I admit that in the exercise of its general jurisdiction, a court of equity may consolidate the trusts in the hands of a single trustee,—and that such intervention would be highly expedient, if any part of the lands in trust remained to be sold. But if, as I apprehend is the case, all the lands were disposed of by the original trustee, if the entire trust estate now consists of money and monied securities, the trusts may be as efficiently fulfilled by the executor of *George Calvert* as by a new trustee. And no necessity would exist for the exercise of the powers of this court, unless it may become expedient to ask for a conveyance to the executor, as trustee of the legal title to the lands sold, if the court should be of opinion that such title is now outstanding in the heirs (under the act to direct descents,) of *George Calvert*. The heir at common law has in fact conveyed the title which was supposed to be in him to *Charles B. Calvert*.

I deny that the act of 1785, ch. 72, sec. 4, has any just application, in letter or spirit to this case. The act provides for the execution of a *power* to sell which had, or should become inoperative by the death or inability of the person named to exercise the *power*. It does not extend in *terms* to a devise of *an estate in lands in trust* to be sold. And in practice, the distinction between a grant of a *power* and the *devise of an estate*, has always been recognized and respected: and where the trustee of the estate dies, the invariable practice is to

resort to a suit in equity, according to the usual forms of the court. I conclude, therefore, that on the facts disclosed by this record, *Charles B. Calvert*, as executor of *George Calvert*, is now the trustee of so much of *Cramphin's* estate as consists of personalty, and that payment of the bonds and judgment in question to him, would discharge the purchaser.

*Second.* My second proposition is, that as the purchaser is in possession, and has been in possession of the premises ever since his purchase thereof, and has shewn no defect in title— he has no equity to stay the payment of his purchase money, under pretence of difficulty in obtaining a conveyance.

The bill assumes that *George Calvert* had a good title; but alleges that his title has now devolved on his heirs-at-law or some other persons, so that the complainant cannot obtain a conveyance without the aid of this court. It does not present the ordinary case of a vendee impeaching the title of his vendor, and therefore asking to be relieved from his purchase; or alleging doubts as to the sufficiency of title, and therefore asking it may be sifted before he is compelled to pay the purchase money. The equity alleged is, that the title being good, there should be a decree for a conveyance before the purchaser is required to pay for the purchase.

Now I agree, that as between vendor and vendee, in the common case of a sale for a gross sum, the *obligations to pay* the purchase money and to make a conveyance, are so far dependent, that on a bill by vendor, the decree will direct first a conveyance,—and next, that on tender of a conveyance, the vendee shall pay. *Seton on Decrees*, 152 (212.) But on a like principle, where the vendee is the complainant, the decree requires first payment of the purchase money, and next a conveyance. *Ib.* 154 (215.)

Take then the case of an agreement, by which the vendee stipulates to pay the purchase money by annual instalments,— and the vendor, that he will convey on payment of the whole purchase money. Here the reciprocal obligations are *independent* of each other; and even at law, the vendor may recover judgment for the earlier instalments, without tendering a

conveyance, or even averring his readiness to make a convey-
ance. The judgments recovered in the present instance, are
conclusive to show that they were properly entered. Where
is then the equity of the vendee to stay execution of a judgment
properly rendered, and pursuant to his agreement? He has
actual possession of the premises purchased. He admits the
title to be unquestionable; and his remedy to enforce a con-
veyance is adequate, and just such as was contemplated at the
time the agreement was entered into. It is not pretended that
the assets of the vendor are insufficient to answer any recovery
that might be had against the executor in damages; nor that
any of the parties in whom the title is vested, have refused
to join in a conveyance. The pretexts are, that it is uncertain
who ought to be parties to the conveyance, and that the in-
fancy of some of the persons supposed to be necessary parties
requires the interposition of this court to make a legal con-
veyance. Now, I deny that any case is to be found in which
it has been adjudged that the infancy of the heirs-at-law of
the vendor entitles the vendee to an injunction to stay execu-
tion of the executor. Nor could any such decision be made,
without a violation of principle. The authority of this court
to decree a conveyance by an infant, in specific performance
of an agreement by his ancestor, is derived from the acts of
1773, ch. 7, 1778, ch. 22, and 1791, ch. 79. Before those acts
there could be no decree requiring an infant, *during infancy,*
to make a conveyance. Hence, if the vendee in *England* could
found an equity on the circumstance of the death of the vendor
leaving infant heirs, he would be entitled to stay execution of
the executor, until the heirs have attained their full age. And
even in *Maryland,* at this day, as the decree is conditional
merely, and the infant heir is allowed a day after his arrival
at full age, to show cause against the decree, the vendee might
(if entitled to an injunction at all,) fairly argue that the injunc-
tion, once granted, should continue, until lapse of time had
rendered the decree absolute and unimpeachable. Now, I
insist, these are necessary and inevitable conclusions, from
the hypothesis, that the death of the vendor gives the vendee

any equity against the execution of the executor. And I submit as the settled and more reasonable and convenient practice, that where the title is admitted, and the remedy of the vendee for a conveyance is clear and adequate, he shall not have an injunction against the vendor—nor against the executor of the vendor, on the ground merely of a personal disability on the part of an heir-at-law, which may be removed by the exercise of the ordinary jurisdiction of this court.

If complainant recently after the death of *George Calvert*, had filed his bill for a specific execution, he could not, at that early day, have stayed the action at law of the executor against him. But conceding the right to equitable interposition once existed, it has been lost by the laches of complainant for ten years since the death of the vendor, and for seven years since the recovery of the original judgments. It cannot be that the vendee, with notice of defects in title, or difficulty as to conveyance, shall be permitted to enjoy possession quietly until the patience of the vendor is exhausted, and then ask that execution shall be stayed, because of doubts or obscurities which diligence on his part would have removed. In *Sugden Vend. (last edition,)* 2d vol. 8, (12,) the cases are collected for the purpose of showing that a purchaser, by taking and silently retaining possession, waives his right to object to the title. *A fortiori* shall delay, and acquiescence in a case where *the title* is satisfactory, be treated as a waiver of the right to object,— that the vendor, or his representative, is not in a condition presently to give a valid conveyance. It is the duty of the vendee to prepare the conveyance, and thereby to indicate the parties who are to unite therein; and for this purpose, he may call on the vendor for an abstract. But the vendor cannot be in default in relation to the abstract, until an abstract has been demanded. Nor is he bound to take any proceedings in relation to the conveyance, until the draft has been tendered to him. If then, the vendee for seven years after the recovery of the judgment by the vendor, delays his application for an abstract and the tender of a draft of conveyance, is there any harshness in holding that he has thereby waived his right to

object, that difficulties exist in regard to the conveyance which promptitude on his part might have obviated? *Vide* 6 *H. & J.* 529, *Williams vs. Mayor, &c.*

*Third.* For the preceding reasons, it is respectfully submitted that the injunction ought to be dissolved. It may be material however, in view of the ultimate disposition of the case, that we should now consider the question raised by the bill, *i. e.* where is the legal title to the land claimed by the complainant? The deed from *Mrs. Davis* to *George Calvert*, vested the title in the latter, and her heirs cannot be necessary parties to the suit. It is conceded that the $30,000 secured to her has been satisfied.

The question then is, did the legal title descend to all the children of *George Calvert*, being his heirs by the act to direct descents? Or to his eldest son and heir by the course of the common law? which involves the construction of the act of 1831, ch. 311, sec. 11.

The object of this act was to prevent the inconvenience which cannot fail to ensue, from allowing trust estates to descend to the heirs by the statute, of the trustee; and to accomplish the object fully, to obviate the evil altogether, the act must extend to all trusts which vest the estate in *one* person, to be taken care of, managed, and applied for the benefit of *others.* And we accordingly find it is made by its letter, to embrace every case where the trustee "shall be seized of the naked legal estate, without having or being entitled to any beneficial interest or estate in the lands," &c. The *naked legal estate* is put in opposition to *a beneficial interest.* So that if the trustee does not take any beneficial interest in the trust— if he is not one of the beneficiaries designed to be provided for, he takes in the view of this act the naked legal estate. And this view is consistent with all the cases. A right to enter upon the trust estate—to take the rents and profits—to sell the principal estate—to apply the proceeds in payment of debts and legacies—all these are powers incident to the *legal title* or estate, as contra-distinguished from the *beneficial use.* And it may therefore safely be assumed, that the act embraces every

case where the beneficial interest would not by the preceding laws have devolved in entirety, or in part, on the heirs of the trustee for their own sakes, in case another person than their ancestor had been the trustee.

Upon this construction, the act embraces the present case, so far as it is dependent on the deed, the will and first codicil; for the trusts of the will and first codicil respect simply the interests of others than the trustee. The last codicil provides, that if the trusts created by the preceding instruments fail of effect, then the estate shall vest beneficially in the trustee. But the trusts of the will and first codicil are capable of execution. It is not alleged in the bill that they are void; nor can any unfavorable presumption be made on the present state of the record. It will be observed, that the provision for the trustee is not residuary—is not to take effect after previous limitations shall have been exhausted : but is a substituted interest, to take effect in case only the preceding limitations shall be declared to be illegal. · If, therefore, those previous limitations of the trust did ever take effect, the ulterior limitation in favor of the trustee is disappointed.

I conclude, then, that the legal title to the land sold to complainant, has devolved on *George H. Calvert,* the eldest son and heir, according to the course of the common law, of the trustee    *He has conveyed all his interest to Charles B. Calvert, who is therefore on my hypothesis able to convey a good title to complainant.*

By Bowie in reply.

All the authorities concur in requiring the purchaser to see to the application of the purchase money, where the trusts are specific charges on the land, and it is no where said, that the creation of trusts which invest discretionary powers in the trustee, or the execution of which are postponed to a future day, by the same deed or instrument, which established the specific trusts, releases the purchaser from the obligation of seeing to the discharge of those which are specific. In other words, a man is not discharged from what is reasonable and

possible, because it is unreasonable to expect him to do what is impossible.

The appellee admits, "the purchaser must apply his money properly" " where the trusts are defined and capable of immediate execution."

A large portion of the trusts declared by the will and codicils of *Mr. Cramphin,* and revived and re-published by the deed of *Mrs. Davis,* are of this kind, viz : annuity to *Caroline Calvert* for life;—pecuniary bequests to *Richard Williams, Ann Williams, Elizabeth Williams* and several others, whose names are not recollected;—such charges, as the books expressly enumerate, as those which the purchaser must see extinguished. *Vide Atk. on Tit.* 597, as before cited.

The appellant designed to insist, that the law imposed this duty upon the purchaser, if the original trustee, *George Calvert,* had lived, and the hand appointed to receive the trust funds had not been cut off by death : a duty rendered more imperative, since the office of trustee became vacant, or devolved upon those, some of whom were incapable of discharging the trusts. To avoid this objection, the appellee asserts, that the deed of *Mrs. Davis* confers the trust on " *George Calvert,* (his heirs, executors and administrators,") and on the death of the trustee, the office of trustee as to the real estate, (as far as it was undisposed of,) devolved on his heirs-at-law, and as to the real, converted by sale into personal estate, upon his executor, for which he cites *Willis on Trustees, p.* 53.

*Willis* lays down the general proposition, that trusts, "when of real estate, devolve by the death of the trustee, on his heir-at-law;" " when of personalty, they vest in his executor or administrator." He does not say that the execution of a trust to sell and convey real estate, in part performed by the original trustee, is to be consummated by his executor, or that where the original trustee has sold the real estate, the trust becomes personalty, and devolves upon the executor or administrator. The trust follows the legal estate of the property conveyed in trust; if the legal estate descends on the heir-

at-law, the trust follows necessarily, " *accessorium sequitur principale*," and with this all the authorities agree; otherwise, on the death of every trustee of realty, who is charged to sell and convey, and apply the proceeds, the office would be divided—the legal estate descending to the heirs, and the control of the proceeds, on the personal representative.   The latter represents the individual, not the trust, and though the legal control of the proceeds should devolve on him, as far as their collection is concerned, their subsequent application belongs to the heir-at-law, privy in estate.

The learned solicitor for the appellee denies the application of the act of 1785, ch. 72, sec. 4, to this case, upon the ground that " it provides for the execution of a *power* to sell, which had, or should become inoperative, by the death or inability of the person named to exercise the power."   It does not extend in *terms* to a " *devise of an estate in lands, in trust to be sold ;*" " and in practice, the distinction between a grant of a power and the devise of an estate in trust, has always been recognized and respected."

The appellant did not contend that this case was embraced in terms, but in its spirit, if not in letter: " *qui hæret in litera, hæret in cortice.*"

" It has always been considered that a devise to trustees and their heirs, upon trust in a given event to sell, or do any other act which may require the inheritance, vests the legal fee in the trustees," and they cannot, upon the construction of any subsequent devise, be held to take merely a power, for that would defeat the express devise to them.   *Sug. on Powers,* 105, cited in *Fletcher on Trustees, p. 62, note (a.)   Sug. on Powers, p.* 127, 6th *London Edit.*

The act of 1785, ch. 72, sec. 4, enacts, " if any person hath died, or shall die, leaving real or personal estate to be sold for payment of debts, or *other purposes,* and shall not by will or other instrument in writing, appoint a person or persons to sell or convey the same property; or *if the person or persons appointed* for the purpose aforesaid, shall neglect or refuse to execute such trust, or *shall die before the execution of such*

*trust*," in every such case, the Chancellor may and shall have authority, &c.

Does not this clause expressly embrace the case of "a devise of an estate in lands in trust to be sold," if not "in *totidem verbis*," yet in equivalent terms? *Sugden* says, "the devise upon trust, in a given event, to sell or do any other act which may require the inheritance," "vests the legal fee in the trustee." Is there any difference between the investiture of a legal fee in a trustee, by implication, *by devise of a power to sell*, and "a devise of an estate in lands in trust to be sold?" if there is, it is merely a verbal distinction. But the appellant insists, the act of Assembly clearly embraces both the devise of a power to sell, and "the devise of estate in lands in trust to be sold," with the view of avoiding the inconveniences and injustice, which the facts of this case demonstrate must result if a different construction prevailed.

The appellant conceives that he has already anticipated and sufficiently answered the second proposition of the appellee, viz: that the possession of the purchaser, and his long acquiescence precludes him from all equity, "to stay the payment of the purchase money, under pretence of difficulty in obtaining a conveyance."

The appellant hath shown that the original trustee had the power to sell and convey when the appellant purchased, and took possession; that his continued possession was in reliance upon the ultimate competency of the trustees' heirs-at-law, to give him a good title; and he had no reason to doubt their intention to give him such a title, until one of them, in his character as executor, sought to enforce the payment of the purchase money, before qualifying himself to give the appellant an equivalent for it.

The appellee asserts, "the bill assumes that *George Calvert* had a good title;" the bill alleges, that *George Calvert* had power *to sell and convey*,—but still it charges, that the trusts were such, that notwithstanding the power to sell and convey, the "purchaser could not have safely paid the purchase money to him, without seeing to the application of the purchase

money." This is not a case of defective title merely, but a case where the title being vested in part in minors, *the lands to be conveyed are subject to incumbrances, which can only be removed by the aid of a Court of Chancery.*

The appellee admits, that as between vendor and vendee, in the common case of a sale for a gross sum, the obligation to pay the purchase money, is dependent on the ability to convey, and " on a bill by vendor, the decree will direct first, a conveyance, and next, on tender of a conveyance, the vendee shall pay. But where vendee is complainant, *vice versa.*" The principle of these decisions is not the relative position of the parties, complainant and respondent, but the common rule of equity and justice, that each shall give a " *quid pro quo,*" if either should come into court, alleging that the land sold was covered by incumbrances of larger or smaller amount, the decree would not be in the first instance, that on a tender of conveyance, the vendee should pay,—or in the second, on payment of the purchase money, the vendor should convey; but that the incumbrances be discharged out of the purchase money, and the case referred to a master, to ascertain what incumbrances existed.

Here the personal representative of the vendor seeks to enforce the payment of the purchase money, without either offering a conveyance, or guaranteeing against incumbrances. It is objected by the appellee, that no case can be adduced in which the minority of the heir of the vendor has been regarded as a sufficient ground for enjoining the payment of the purchase money; that until the acts of 1773, ch. 7; 1778, ch. 22; 1791, ch. 79, there was no authority in this State for a decree requiring an infant during infancy to convey, and if in *England,* " the vendee could found an equity on the circumstance of the death of the vendor leaving infant heirs, he would be entitled to stay execution of the executor, until the heirs have attained their full age."

The appellant does not find it necessary to controvert this position, because he does not seek the intervention of the Court of Chancery, upon *the sole ground* of the minority of

the vendor's heirs, but he assigns this as one of the reasons why the incumbrances charged on the land cannot be removed by them. To show, however, the effect of infancy upon the disposition of the purchase money in *England*, he quotes the following from *Chitty's Equity Dig. Tit. Inf'ts, p.* 541: "The vendor dying intestate, and leaving an infant heir, the purchase money being paid into court, in a suit for a specific performance instituted after his death, *will be retained until the heir attains twenty-one, and conveys.*" *Bullock vs. Bullock,* 1 *Jacob & Walker's Rep's,* 603.

The executor of the vendor is not permitted to handle the purchase money, however abundant the assets, or inexhaustible his resources; the money is held in pledge, until the heir attains twenty-one, and conveys.

Should there be less security given to purchasers in *Maryland?*

The executor of the vendor as such, has no right to the money he seeks to enforce from the appellant; it constitutes a fund specially dedicated to specific purposes, and until the trust, of which this money is a part, is executed by a legally constituted trustee, competent to release and discharge all paying to him, and to give a "*quid pro quo,*" for what he receives, the money or securities for it, should remain in the custody of the law. The last additional point presented by the appellee is, " that the legal title to the land sold to complainant has devolved on *George H. Calvert,* the eldest son and heir," who has conveyed to the appellee all his interest, and therefore, *the appellee is able to convey a good title to complainant.*

The act of 1831, ch. 311, sec. 11, is referred to as that which conferred the legal estate in the lands in question upon *George H. Calvert,* the eldest son and heir-at-law of *George Calvert,* the original trustee.

The act as quoted by the appellee, embraces only trustees " who shall be seized of the naked legal estate therein, without having or being entitled to any beneficial interest or estate whatsoever in said lands," &c. The deed of *Mrs. Davis*

makes *George Calvert* a *beneficiary*, by first authorizing him to reimburse himself out of the estate, for all costs, charges and expenses, incurred in the contestation of said will and codicils of said *Cramphin*, (and the sum of $30,000 paid to the grantor, if the appellant is not mistaken.) The right to reimburse himself the costs, charges and expenses, clearly constituted something more than a naked legal estate in the trustee, and independently of the codicil of *Mr. Cramphin*, which declares *George Calvert* the devisee of his estate, in the event of the legal incapacity of the other legatees, must exclude this trust from the operation of the act referred to.

Such being the case, the legal estate would descend, pursuant to our act to direct descents, upon the children and descendants of the original trustee generally.

If, however, the act of 1831, ch. 311, sec. 11, should be held to include the present trust estate, it does not impair the complainant's right to insist, that the purchase money shall be applied under the decree of the court, to the specific purposes to which it was appropriated, and that the appellee be in the mean time enjoined from enforcing its collection.

The power to sell and convey does not dispense with the obligation on the purchaser to see to the application of the purchase money.   *Vide Atk. on Titles, London Edit.* 598, 599.

FRICK, J. delivered the opinion of this court.

The bill charges that *Thomas Cramphin*, of *Montgomery* County, deceased, devised to *George Calvert* and his heirs, his real estate, to be sold and applied to certain purposes, expressed in his will.   That *Elizabeth Davis*, who claimed as heir-at-law of *Cramphin*, and had successfully contested the validity of the will and its codicils, afterwards compromised the dispute by conveying to *Calvert*, all her interest in the estate, in trust to provide, in the first instance, for the payment of a large sum of money to herself; and then in further trust, for the purposes expressed in *Cramphin's* will.   The terms creating this trust are, "in trust to hold, apply and appropriate the estates hereby granted, or in case of the sale of them,

or any part of them, the said proceeds, to and for the same uses, trusts, purposes and objects as are expressed and declared in the said instruments of writing, purporting to be the last will and testament, and codicils thereto, of the said *Thomas Cramphin.*"

In the month of August, 1837, the appellant purchased from *Calvert,* a part of the land thus conveyed to him for the sum of $2,852, for which he executed to *Calvert,* his four several single bills, payable in equal instalments in one, two, three and four years from the date. *Calvert* afterwards died, and his executor, *Charles B. Calvert,* instituted suits at law on *three* of the single bills, which had become due, and recovered judgment against the appellant at March term, 1841, in *Montgomery* County Court, which judgment was afterwards at November term, 1846, revived, and *fi. fa.* issued thereon. In the mean time, the fourth and last instalment of the purchase money had become due.

This bill is hereupon filed, invoking all the heirs of *George Calvert,* and all the *cestui que trusts* under the will of *Cramphin,* (many of whom are minors,) as defendants praying that the executor may be enjoined, until a trustee shall be appointed by the court, to receive and apply the whole purchase money, which he is willing to pay whenever there is a person in being competent to convey the land, so sold by *George Calvert,* in his life-time, to the appellant.

The answer of *Charles B. Calvert,* the executor, admits the purchase made by the appellant upon the terms mentioned in the bill, and the recovery of the judgment on the three instalments of the purchase money. It insists that the title to the land, which is unquestionable, is now vested in the heirs-at-law of *George Calvert,* and that the appellant has had sufficient time to obtain from them a conveyance by the proper proceeding in equity.

The injunction which, in the first instance, was issued on the filing of the bill, upon coming in of the answer, was by order of the Chancellor, dissolved,—and from this order, the present appeal is taken.

In support of the appeal, the appellant contends, that the title in question was suspended by the death of *George Calvert*, the trustee, or vested in persons incapable of making the conveyance; and that the property being subject to limited trusts, which required the purchaser to look to the application of the purchase money, there was no hand in being to receive, and to which he could safely pay, without the intervention and appointment of a trustee by a Court of Chancery.

It has long been a general rule of Chancery practice, that the purchaser shall not be required to pay his money to one who is not competent to give him a good title to the purchase. Where, however, there is such person competent or appointed to receive it, and give a discharge, the purchaser is not generally required to see to the application of the money.

" The right to a good title is a right, not growing out of the agreement between the parties, but given by the law; that as the purchaser parts with good money, the vendor shall give an estate with a clear title." *Atkinson on Tit.* 379.   25 *Law Library*, 168.

Is there in the case before us such a person competent to convey, and to give the discharge for the purchase money? It is affirmed in one view taken by the appellee's counsel, that the legal estate in the lands descended to the heirs-at-law bound by this agreement between the purchaser and the original trustee, while the bonds in question devolved upon the appellee as executor,—and being at his death, converted into personal estate by force of the trust to "*George Calvert*, his heirs, executors and administrators," the office of this trust devolved upon his executor.

In support of this proposition, *Willis on Trustees, page* 56, is cited.   The doctrine in *Willis* is thus stated: " trusts, when of real estate, devolve by the death of the trustee on his heir-at-law; when of personalty, they vest in his executor or administrator;" and this, of course, in the latter clause, is true, where the trust consists of personal estate.   But it is neither said or meant, that where the trust is originally of real estate, and in part executed by sale from the original trustee,

that the trust can become personalty, and be consummated by the executor. All the authorities agree, that when the legal estate descends to the heirs-at-law, the trust is transmitted with it. For if otherwise, on the death of every trustee charged with the sale of real estate, the functions of the trust, by a sale in his life-time, would fall into separate hands; the purchase money passing into the hands of the personal representatives, not as assets, but as a trust fund, while the title descends to the heirs-at-law.

At common law, on the decease of the trustee, the estate will descend to the heir. *Lewin on Trusts,* (242.) 24 *Law Lib.* 123. Trusts descend to the heir of the person who was last entitled to them, in the same manner as legal estates. *Cruise,* 1 *vol.* (485.)

The trust thus devolving upon the heirs-at-law of *George Calvert,* some of whom are minors, can the purchaser under this trust, safely resort to the usual mode of obtaining his conveyance, without seeing at the same time, that they are capable of giving him a full discharge? Is the law so clear, and the course of the appellant so safe, that he may pay his money without the concurrence of those beneficially interested? If these trusts are a charge upon the land purchased, is he not bound to see it satisfied? The will and codicils of *Thomas Cramphin,* which are revived by the terms of the deed from *Mrs. Davis,* create trusts by way of annuities and pecuniary bequests to the parties there named, which are expressly charged upon the lands conveyed by her to *Calvert,* and would seem to be precisely such charges as the purchaser is to see extinguished. When the trusts are general, as for the payment of debts generally, no such obligation exists. 3 *Sugden,* 97, (152.) But if for the payment of legacies or debts, which are scheduled or specified, the trust being defined and limited, equity holds it reasonable, that the purchaser should see to the application of the money. *Ibid,* 98.

In equity, the party beneficially entitled to the produce of the estate—that is to say, the *cestui que trusts* of the purchase money, and not the trustee or donee of the power of sale, is

considered to be the owner: and on this principle, it is that the purchaser is bound, at the hazard of having his money to pay over again, to pay it to the *cestui que trusts*, or see that it comes to his hands; or in other words, to see to its application. *Atkinson*, 597.

And the only cases in which it would appear safe, that the purchaser shall not look to the application of his money, is where the trusts are undefined and general in their nature; unless the trustee, by the terms of the deed itself, is authorized to give a receipt, and discharge the purchaser from seeing to its application. Without such authority or clause in the deed, where the trust is specific and limited, the rule is uncontroverted, that the purchaser must see his money properly applied. *See Atkinson*, 598—600. Many of the trusts in the will of *Cramphin*, are of this character. An annuity to *Caroline Calvert* for life;—pecuniary legacies to *Richard*, *Ann* and *Elizabeth Williams*, and others. And whatever may be the general nature and character of the other provisions and trusts in the will, these are sufficient to warn the purchaser to look for the proper party, on whom the execution of them devolves by the death of the original trustee. Is it not precisely the case where recourse must be had to the Court of Chancery, to see that a competent hand is appointed to receive the fund, and discharge the specific and ulterior provisions of this trust?

Suppose that *George Calvert* had died before this sale to the appellant. The legal estate here descends to all his heirs. Could the execution of this trust, by operation of law, attach to all the heirs named in this bill, infants and others? If they take in the same character, as the original trustee, is such a trust susceptible of execution by all the heirs? or is not the interposition of a court of equity, indispensable to carry out its provisions, by the hands of some person competent to convey title and discharge the trusts?

And certainly such interposition is the more necessary now, *when after the sale*, it is sought to direct the whole fund into the hands of the executor, as competent to discharge this extended trust, while every separate purchaser is required to

resort to the circuitous process in equity, against all the heirs of the trustee to secure their title.

The appellant has, in our opinion, adopted the safe and the true course. He seeks by his bill, to place himself in the condition of a purchaser, under the decree of a Court of Chancery; and by bringing the *cestui que trusts* into court, most of whom are incompetent to convey, to obtain his title by the intervention of a trustee of that court. If he could be compelled to pay the purchase money to the executor, and then seek his title against the heirs, while it was doubtful, under the circumstances of the trust, whether they were the proper parties to convey, it would be a case of severe injustice and hardship. He ought not to be required to incur the costs of such proceeding against absent defendants and infants, for which he may never be reimbursed, and the very question at issue is whether they are competent to convey. It has been argued, and is one of the points made by the counsel of the appellee, that the title in this case devolved on *George H. Calvert*, the eldest son and heir-at-law, under the act of 1831, in conformity with the doctrine of the common law, in relation to trust; and that *George H. Calvert*, having conveyed all his interest to the appellee, he is the competent and proper party to convey the title to the appellant.

We shall hereafter shew that the act of 1831, does not reach this case. And yet this is one of the alternatives of title, which the appellee offers, while the other is represented to be in the heirs, conformable to the act of descents. If the title is not, strictly speaking, doubtful, it is, at least, admitted, that it was questionable, on whom it devolved at the death of the original trustee. And was the vendee, in such case, to make the selection, at his own hazard; first to pay his money and then to grope through these multiplied trusts in search of his title? This was not his affair, and he was therefore right, in withholding the payment, until the beneficiaries under the trusts, presented the hand indisputably entitled to receive it. And when attempted to be enforced at law, it was his only resource, to seek his present remedy and protection in Chan-

cery.    The bill does not impeach the title of his vendor, but alleges that it has devolved on his heirs-at-law, *or some other person,* so that he cannot obtain a conveyance, without the aid of the court.    He avers his willingness to pay the purchase money, as soon as the hand is in being to receive it; and in the opinion of this court, has made out a good case for the interposition of the Chancellor.

This view of the case is a sufficient answer to the further objection, that the appellant, by his own delay, has waived his right to object, that being in possession of the premises, ever since his purchase, he has no equity now to stay the payment, on pretence of difficulty in obtaining a conveyance, and that whatever right to equitable interposition may once have existed, he has forfeited by his own negligence.    If by the death of *George Calvert,* the trust devolved upon those who were incapable to perform its functions, he is not required to proceed, at his risk and cost, to unite the office and estate in another trustee competent to execute the trusts and convey the estate.    Upon payment of his purchase money, he was entitled to an indisputable legal title.    The heir at common law, who it is said takes the estate and the trust under the act of 1831, conveyed the title supposed to be in him, to *Charles B. Calvert,* the executor and appellee.    Suppose the appellant to have paid either, and taken his conveyance, would it not be just matter of complaint that he should, at his own cost, afterwards be turned over to perfect his title, from the heirs-at-law, or the *cestui que trusts?*    When his resort was not clear and adequate he could only fortify himself, by withholding the purchase money, more especially, where it became his duty to secure its proper application.    In this respect the delay is not *Duffy's,* for if he had been ready to pay the whole purchase money, there was none competent to give him a discharge.    In satisfying the bonds he had no assurance that the money would not be applied by the executors as assets of the estate of *George Calvert.*    In procrastinating the payment and holding out against the judgment of the executor, he might, without presuming too far, have supposed proceedings to have been instituted at the

same time, to supply the place of the original trustee. The heirs of *Calvert* were themselves ulterior beneficiaries under the will of *Cramphin*, and they and the legatees, might well be supposed to have applied at the proper *forum* to revive the hand required to execute these trusts. The laches therefore have not been entirely on the side of the appellant. Nor has any serious injury resulted to the parties in interest, by delaying until the means of perfecting the title should be matured by them, because, as is properly said by the appellant's counsel, the property being bound for the amount, as well as the sureties on the bonds given for the purchase money, the delay is compensated by the payment of interest.

The act of 1831, ch. 311, sec. 11, has been referred to as conferring upon *George Calvert*, the eldest son and heir-at-law, the legal estate in the lands in question; thus disposing of the whole subject before the court, and relieving all difficulty between the parties, by furnishing the proper hand to execute the conveyance and receive the purchase money.

Naked trusts, when the trustee has the legal title without any beneficial interest in the trust under this act of 1831, are made to descend as at common law. The words of the act are, "trustees who shall be seized of the naked legal estate therein, without having, or being entitled to any beneficial interest or estate whatsoever in the lands." Is not *George Calvert*, in every sense, a beneficiary under the deed of *Mrs. Davis?*

He is first to reimburse himself out of the estate, the costs, charges, and expenses incurred by him in contesting the will and codicils of *Cramphin*, and the last codicil of the will provides, that if the previous trusts created by the instrument fail to take effect, then the estate is to devolve upon *George Calvert* as devisee. The right to reimburse himself, the heavy costs and charges incurred in the attempt to sustain the will of *Cramphin* out of the very trust in his hands, must clearly bring this case within the exception of the act of 1831.

But when the ulterior limitation in her favor, which confers upon him the whole estate, upon the possibility that the other trusts may fail, is superadded, it is clearly such a beneficial

66      v.6

Duffy *vs.* Calvert.—1848.

interest, as seems to have been expressly in view, and must exclude this trust from the operation of the act referred to. This being the case, the trust estates have here descended to the heirs of the trustee by the act to direct descents. Some of these heirs, as infants, are legally incompetent to convey, and even if the aid of a court of equity was invoked for this purpose, the title obtained by such proceeding, would not discharge the purchaser from looking to the application of the purchase money. In this view of the case, the *cestui que trusts* are necessary parties to any proceeding, which looks to a conveyance to the appellant. Any attempt to enforce the payment of the purchase money, without such assurance of title, was properly met by the appellant, in bringing before the court all the parties in interest and estate, united, seeking to enjoin them, until a trustee should be substituted for the original trustee, to receive and apply the purchase money, and convey the lands sold to the purchaser. If this application had been made by the appellant upon the three instalments alone, upon which judgments had passed, and before the last instalment became due, the Chancellor would have been right in dissolving the injunction; because, until the fourth instalment was due, the appellant could have no claim to a conveyance of the lands. But the whole purchase money having become due at the filing of the bill, and the appellant being willing to pay, upon receiving such discharge and conveyance as he is entitled to, it becomes necessary that time should be allowed, and the proper steps be taken to bring in the parties to the bill.

The order of the Chancellor is, therefore, reversed, and the injunction continued in force. And that such proceedings may be there had, as are in conformity with the principles expressed in this decision, the cause is remanded to the Court of Chancery.

**DECREE REVERSED AND CAUSE REMANDED.**